People v Monk (2025 NY Slip Op 01976)

People v Monk

2025 NY Slip Op 01976

Decided on April 3, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 3, 2025

113389 CR-24-0093
[*1]The People of the State of New York, Respondent,
v
Jovon L. Monk, Appellant.

Calendar Date:February 19, 2025

Before:Egan Jr., J.P., Aarons, Pritzker, Lynch and Ceresia, JJ.

Marlene O. Tuczinski, Chatham, for appellant.
Matthew Van Houten, District Attorney, Ithaca (Veronica E. Fox of counsel), for respondent.

Pritzker, J.
Appeals (1) from a judgment of the County Court of Tompkins County (Scott Miller, J.), rendered April 1, 2022, upon a verdict convicting defendant of the crimes of rape in the first degree, criminal sexual act in the first degree and sexual abuse in the first degree, and (2) by permission, from an order of said court, entered December 12, 2023, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
Defendant was convicted, after a jury trial, of rape in the first degree, criminal sexual act in the first degree and sexual abuse in the first degree stemming from the April 2020 sexual assault of the victim. After an unsuccessful CPL 330.30 motion to set aside the verdict, defendant was sentenced to two concurrent prison terms of 12 years, to be followed by 12 years of postrelease supervision, on the rape and criminal sexual act convictions and a concurrent prison term of six years, to be followed by six years of postrelease supervision, for the sexual abuse conviction. Defendant then moved pursuant to CPL 440.10 to vacate the judgment of conviction on the ground of ineffective assistance of counsel. County Court denied defendant's motion finding that defense counsel provided meaningful representation. Defendant appeals the judgment of conviction and, by permission, the denial of his CPL 440.10 motion.
We turn first to defendant's contention that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. As an initial matter, defendant concedes that his legal sufficiency challenge is unpreserved (see People v Decker, 218 AD3d 1026, 1028-1029 [3d Dept 2023], lv denied 40 NY3d 1012 [2023]; People v Colvin, 218 AD3d 1016, 1017 [3d Dept 2023], lv denied 40 NY3d 1038 [2023]). Even so, his weight of the evidence challenge, which does not require preservation, "obliges this Court to assess whether each element of the crimes for which he was convicted was proven beyond a reasonable doubt" (People v Diaz, 213 AD3d 979, 980 [3d Dept 2023], lv denied 40 NY3d 928 [2023]; see People v Robinson, 183 AD3d 1118, 1119 [3d Dept 2020], lv denied 35 NY3d 1069 [2020]). As relevant here, "[a] person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion" (Penal Law former § 130.35 [1]). "A person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct . . . with another person . . . [b]y forcible compulsion" (Penal Law former § 130.50 [1]), and "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact . . . [b]y forcible compulsion" (Penal Law § 130.65 [1]). Within the context of sex offenses, " '[f]orcible compulsion' means to compel by . . . use of physical force" (Penal Law § 130.00 [8] [a]).
The victim testified that, on the night of the incident, she was drinking in a car behind her residence [*2]with defendant and a mutual friend (hereinafter the friend) before going to the victim's apartment to continue drinking. Shortly thereafter, the friend left and the victim and defendant continued to drink and talk in the victim's apartment. The victim left her apartment to make a phone call and, during this time, defendant began sending her sexually suggestive text messages. At one point, the victim responded "Nah," which she testified meant that she was not interested in having any sexual relations with defendant. When the victim returned to her apartment, where defendant was, she used the bathroom. After coming out of the bathroom, the victim testified that defendant began to approach her and that his demeanor changed from smiling to aggression. The victim testified that defendant then pushed her onto the bed and pulled off her pants. She attempted to lock her legs and struggle, but defendant held her legs up and began to lick the outside of her vagina before putting his penis inside her vagina. The victim testified that she was crying and struggling to get defendant off her, but he had her legs locked. He then turned her onto her stomach, held her shoulders down so she could not move and continued to vaginally penetrate her. While this was occurring, the victim testified that she called the friend, told her what was happening and asked her to come help. Defendant hung up the victim's phone, so she texted the friend asking her to come help. The friend's testimony corroborated this. The friend testified that, during these phone calls, she heard the victim yelling at defendant to stop and leave but he would not talk back to her, and the friend described the victim as scared and crying. The victim also testified that, during the incident, she recorded a video which was admitted into evidence. The victim explained that, just before taking the video, she told defendant no multiple times and attempted to kick him off her. Ultimately, the victim was able to kick defendant off of her and leave her apartment. After she left, defendant texted her "pl[ease] don't make it more than what it is," "Pl[ease] I'm gone" and "Sorry." Later that night, the victim went to the hospital, where she underwent a sexual assault examination. The sexual assault nurse examiner who performed the examination testified that she observed a five-millimeter tear outside of the victim's vagina, which she testified was consistent with blunt penetrating trauma. Subsequent DNA analysis of swabs taken during the examination revealed male DNA but no semen. Testimony demonstrated that the probability that an individual other than defendant had the same genetic makeup present in the DNA obtained was 1 in 29,894. The DNA analyst explained that she did not know specifically where the male DNA came from, so she could not state with certainty that either defendant's penis or tongue came into contact with the victim's vagina.
Defendant, in his testimony, confirmed that he was the individual in [*3]the victim's video. Defendant also testified that he kissed the victim's thighs but did not have any contact with the victim's vagina. Defendant also stated that he did not use any force. Defendant testified that he was unable to get an erection which disappointed the victim, embarrassed him and caused them both to put on their clothes and him to leave the apartment. On cross-examination, defendant testified that he believed the text messages shown to the jury and testified to by the victim were not complete, and that there were missing text messages from the victim illustrating consent. However, defendant stated that he lost his phone and therefore could not produce the messages. "The conflicting testimony of the victim and defendant presented a classic he-said she-said credibility determination for the jury to resolve, and, although a different verdict would not have been unreasonable, we accord deference to the jury's determination that the victim's testimony was more credible than that of defendant and conclude that the weight of the evidence supports the verdict" (People v Kiah, 156 AD3d 1054, 1056 [3d Dept 2017] [internal quotation marks and citation omitted], lv denied 31 NY3d 984 [2018]; see People v Rivera, 206 AD3d 1356, 1358 [3d Dept 2022], affd 39 NY3d 1062 [2023], cert denied 599 US ___, 143 S Ct 2675 [2023]). "Accordingly, deferring to the [jury's] credibility determination[s] and viewing the evidence in a neutral light, we find that the convictions are not against the weight of the evidence" (People v Christie, 224 AD3d 1097, 1100 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Khalil, 206 AD3d 1300, 1305 [3d Dept 2022], lv denied 38 NY3d 1188 [2022], cert denied 598 US ___, 143 S Ct 2439 [2023]).
A new trial is required, however, because defendant was deprived of the effective assistance of counsel. "A criminal defendant is guaranteed the effective assistance of counsel by both the US and NY Constitutions and, pursuant to the more stringent standard under the NY Constitution, receives it when the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Dunham, 231 AD3d 1437, 1439 [3d Dept 2024] [internal quotations marks and citations omitted]). "To prevail [on an ineffective assistance of counsel claim], the defendant must demonstrate the absence of strategic or other legitimate explanations — i.e., those that would be consistent with the decisions of a reasonably competent attorney — for the alleged deficiencies of counsel" (People v Wilcox, 231 AD3d 1350, 1351 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Schuler, 231 AD3d 1285, 1286 [3d Dept 2024], lv denied 42 NY3d 1082 [2025]).
As discussed in the weight of the evidence analysis, the issue at trial distilled to credibility, especially given that the victim and defendant testified [*4]to diametrically opposed series of events. In light of this, it was imperative for defense counsel to demonstrate that the victim's testimony regarding the events of the night in question was not credible. Despite this, during counsel's opening statement, he commented that, in his training representing victims of sexual assault, "the first thing I had to do was believe the accuser. I didn't have a problem with that. I mean, why would someone make up an important detail or leave out certain details and accuse someone of a crime like rape?" Not only did counsel seemingly vouch for the victim's credibility in this first opportunity to address the jury, but he also did the same in his summation, again reminding the jury that he had represented victims of sexual assault, stating that he "start[s] by believing it. I don't sense any ill will from [the victim]" and that he knew "a verdict of not guilty in this case is not going to make anyone happy." While defense counsel, in an affidavit in support of defendant's CPL 330.30 motion averred that his "strategy included being gentle with the [victim] so that she would not be emotional on cross-examination," this does not explain a strategic reason for vouching in general for victims of sexual assault, as well as for this particular victim, in his opening statement and summation. Defendant argues that these statements ran the risk of shifting the burden to defendant to disprove the victim's version of events based upon some inherent credibility suggested by defense counsel just because of her status as a sexual assault victim. Plainly stated, especially given the significance of the jury's credibility determinations, we cannot say that counsel's remarks were "consistent with strategic decisions of a reasonably competent attorney" (People v Benevento, 91 NY2d 708, 712 [1998] [internal quotation marks and citation omitted]; accord People v Watkins, 42 NY3d 635, 639 [2024], cert denied ___ US ___, 145 S Ct 459 [2024]).
Additionally, while cross-examining the friend, defense counsel elicited testimony that defendant had been in and out of jail for 10 years, was a regular drug user, had sold cocaine before and was a parolee who was violating parole conditions by being out past curfew as well as consuming alcohol and cocaine, which he also provided to the friend, on the night of the incident. Thereafter, when defendant chose to testify as to his version of events, County Court determined that since defense counsel had questioned the friend regarding defendant having been on parole at the time of the incident and in and out of prison for 10 years, the door had been opened for the People to pursue those lines of questioning with defendant on cross-examination.[FN1] This is significant because, due to the court's Sandoval ruling, prior to defense counsel opening the door, the People were prohibited from questioning defendant regarding these things. While this testimony did not directly undermine defendant's credibility, [*5]again the paramount issue at trial, it no doubt left a less-than-favorable impression in the jurors' minds, which is notable within the context of this case "since defendant was the only available source of testimony in support of his defense" that no sexual acts occurred (People v Miller, 11 AD3d 729, 730 [3d Dept 2004] [internal quotation marks, brackets and citation omitted]). As such, we discern "no plausible tactical reason for those inquiries" (People v Hollins, 221 AD2d 863, 864 [3d Dept 1995]; see People v Fleegle, 295 AD2d 760, 763 [3d Dept 2002]; see generally People v Gavalo, 87 AD3d 1014, 1015 [2d Dept 2011], lv denied 18 NY3d 994 [2012]).
Compounding these errors, during the People's summation, the prosecutor repeatedly improperly vouched for the victim's credibility (see People v Wilhelm, 34 AD3d 40, 54-55 [3d Dept 2006]), without objection from defense counsel, one time going so far as to say that the victim "testified credibly, consistently, believably and authentically." Defense counsel's failure to object to this repeated vouching is even more problematic given his own insinuations that the victim, as a sexual assault victim, should be believed. And, in her final remarks, the prosecutor informed the jury that they were "empowered with the ultimate responsibility today. You have the responsibility to protect those who cannot protect themselves, to seek justice for those who cannot seek justice for themselves. That's your duty as jurors." However, despite the prosecutor improperly attempting to "sidetrack[ ] the jury from its ultimate responsibility — determining facts relevant to guilt or innocence" (People v Calabria, 94 NY2d 519, 523 [2000]; see People v Williams, 234 AD3d 1180, 1183-1184 [3d Dept 2025]), defense counsel again failed to object.[FN2] We discern no strategic or other reason for defense counsel's failure to object to these improper and inflammatory comments made by the prosecutor (see People v McCray, 140 AD3d 794, 797-798 [2d Dept 2016]; People v Miller, 87 AD3d 1075, 1077 [2d Dept 2011]; compare People v Foulkes, 117 AD3d 1176, 1177 [3d Dept 2014], lv denied 24 NY3d 1084 [2014]).
In light of the foregoing, while we are certainly mindful that this Court must not "second-guess[ ] [trial counsel] with the clarity of hindsight to determine how the defense might have been more effective" (People v Clark, 231 AD3d 1291, 1294 [3d Dept 2024] [internal quotation marks and citations omitted]; see People v Sposito, 193 AD3d 1236, 1241 [3d Dept 2021], affd 37 NY3d 1149 [2022]), given the facts of this case and the importance of the jury's credibility determinations, "we can perceive of no strategic reason or legitimate tactical explanation" for counsel's aforementioned actions, or inactions as the case may be (People v Carnevale, 101 AD3d 1375, 1381 [3d Dept 2012]; compare People v Sposito, 193 AD3d at 1241). "While counsel's errors in this regard, individually, may not necessarily rise to the level of ineffective assistance, [*6]we find that the cumulative effect of defense counsel's actions deprived defendant of meaningful representation" (People v Taylor, 156 AD3d 86, 96 [3d Dept 2017] [footnote, internal quotation marks and citations omitted], lv denied 30 NY3d 1120 [2018]; see People v Bush, 107 AD3d 1302, 1303 [3d Dept 2013]; People v Arnold, 85 AD3d at 1334; People v Miller, 11 AD3d at 730). "This is especially so where, as here, the determination of guilt . . . hinged on sharp issues of credibility" (People v Clarke, 66 AD3d 694, 698 [2d Dept 2009] [citations omitted]; see People v Taylor, 156 AD3d at 97). Given the foregoing, defendant's remaining contentions have been rendered academic.
Egan Jr., J.P., Aarons, Lynch and Ceresia, JJ., concur.
ORDERED that the judgment and the order are reversed, on the law, motion granted and matter remitted to the County Court of Tompkins County for a new trial.

Footnotes

Footnote 1: We are also given pause by the fact that, as alleged by defendant in his CPL 440.10 motion and confirmed by a statement on the record at trial, it appears that defendant, until the last minute, was steadfast in his refusal to testify. In fact, counsel informed County Court that he and defendant were disagreeing because defendant was saying he wouldn't testify but counsel "fe[lt] strongly and [thought] strongly that [defendant] should take the stand in his defense." The court gave a brief recess for defendant and counsel to discuss this disagreement, which resulted in defendant electing to testify. Defendant argues that counsel erroneously informed him that the People could not cross-examine him regarding his parole status and having been in and out of prison. The record does lend some support to this argument as it was not until after the break and defendant choosing to testify that counsel asked the court to review the Sandoval ruling. While doing so, the People confirmed that defendant had opened the door to being cross-examined regarding his parole status and having been in and out of prison over the prior 10 years.
Footnote 2: Defendant, in his brief, contends that he was also deprived of a fair trial due to prosecutorial misconduct based upon these, and other, comments made during the prosecutor's summation. Because defense counsel failed to object to any of these comments, they are not preserved for our review (see People v McNealy, 230 AD3d 917, 920 [3d Dept 2024], lv denied 42 NY3d 1021 [2024]), however, we are addressing these claims in the context of defendant's argument that counsel was ineffective for failing to object to these statements (see People v Robinson, 183 AD3d 1118, 1122 [3d Dept 2020], lv denied 35 NY3d 1069 [2020]). That said, at retrial, we caution the People to abide by the "well-settled principles" which place limitations upon prosecutors at trial, despite the "broad latitude permitted to the prosecutor in responding to defense counsel's summation" (People v Wilhelm, 34 AD3d at 54, 55 [internal quotation marks and citation omitted]).